UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
    KENYA YOUNG,

                            Plaintiff,

              - against -

    COMMISSIONER OF SOCIAL SECURITY,

                        Defendant.
----------------------------------------------------------- X

**MEMORANDUM DECISION AND ORDER**

21-cv-1264 (BMC)

**COGAN**, District Judge.

Following a hearing before an Administrative Law Judge, the Commissioner of Social Security found plaintiff was not disabled, as defined under the Social Security Act, and, therefore, could not receive disability benefits or supplemental income. Plaintiff seeks review of that decision. The ALJ found that plaintiff has severe impairments of obesity, PTSD, and bipolar disorder. Nevertheless, he also found that plaintiff has sufficient residual functional capacity to perform work that is limited to simple tasks, and calls for only occasional contact with supervisors, co-workers, and the public.

In her motion for judgment on the pleadings, plaintiff challenges the weight that the ALJ gave to three pieces of evidence in the case. These were: (1) a medical source statement by her psychiatric nurse practitioner, Jonathan Reece, in January 2019; (2) an evaluation performed by a psychologist, Dr. John L. Miller, at the request of the SSA, also in January 2019; and (3) the assessments of two review psychologists of the state agency, Drs. K. Gawley and L. Haus, in February 2019 and April 2019, respectively.

I have identified these three sources in descending order according to their perceptions of plaintiff's mental impairments – that is, Mr. Reece thought she was the most impaired; Dr. Miller thought her impairment was not quite as bad as Mr. Reece, but still found her very impaired; and the two agency psychologists thought her impairment was not too bad at all.  The ALJ found that Mr. Reece's evaluation "is simply not consistent with the substantial evidence of record"; that Dr. Miller's evaluation was "only somewhat persuasive" because the evidence "simply does not consistently reflect such pronounced issues with emotional or behavioral control;" and, that the agency psychologists' opinions were "persuasive" because they "are each well-supported with reasonable explanations" and "consistent with the substantial evidence of record."

Two points should be noted at the outset.  First, there is some attraction to plaintiff's argument that the ALJ got it backwards.  All things being equal, one might think that the opinion of the professional having the most intensive contact with plaintiff over the longest period (Mr. Reece) would have the most probative value on the degree of her impairment; next would come Dr. Miller, who had, at least, examined her; and last would come the two agency psychologists, who it appears did not even meet plaintiff and based their opinions on a records-only analysis.  Thus, the issue is whether there was substantial evidence supporting the ALJ's decision to reverse what one might otherwise perceive as the likely order of probative value.

Second, plaintiff has tried to argue that the Commissioner needed to present substantial evidence demonstrating plaintiff could perform jobs in the national economy.  Specifically, plaintiff posits that the set of limitations the ALJ put to the vocational expert via a hypothetical question did not accurately reflect plaintiff's disability.  Perhaps plaintiff adopts this position because at that stage of the disability analysis the Commissioner has the burden of proving that plaintiff is capable of working.  But plaintiff's argument confuses the law.  The hypothetical

perfectly expressed the ALJ's assessment of plaintiff's residual function capacity (RFC). The real issue is whether the ALJ's assessment of plaintiff's RFC was supported by substantial evidence. This means plaintiff had the burden of proving the severity of her impairment to the ALJ before the ALJ posed his hypothetical question to the vocational expert.

In my view, determining whether there is substantial evidence supporting the ALJ's assessment hinges on how the ALJ addressed Mr. Reece's medical source statement. As suggested above, Mr. Reece's responses to the ALJ's questionnaire showed a degree of impairment consistent only with a finding of disability. Mr. Reece stated that his most recent examination of plaintiff showed her to be angry, irritated, depressed, anxious, lacking focus, and with a blocked memory. He noted that plaintiff "does not work well w/others due to her anger problems"; that her ability to do work related activities was limited by a "poor memory;" that a "lack of concentration" limited her ability to follow instructions or schedules and maintain a reasonable pace; that she was limited in social interaction because of her "lack of social contact [caused by her] anger & anxiety"; and that she could not travel alone on public transportation. As plaintiff points out, acceptance of this opinion would make it difficult to conclude that plaintiff can consistently work an 8-hour day.

Plaintiff's description of Mr. Reece's work with her is incomplete and unhelpful.[1] From 2017 through 2020, Mr. Reece saw plaintiff approximately once a month at the Interborough Developmental & Consultation Center (IDCC) in Williamsburg. Plaintiff's medication was adjusted based on these sessions. But Mr. Reece was only the highest license holder (as an

---

[1] Plaintiff's attorney put in a perfunctory 13-page supporting memorandum with wide margins, lots of white space, and boilerplate law. This left the Court with the task of plowing through every one of the voluminous treatment notes – the most important evidence in the case – to get a sense of the longitudinal nature of plaintiff's impairment. In essence, the Court treated this record as it would have if plaintiff were *pro se*. Counsel should keep in mind that judges are not required to "trudge the dry desert of the record . . . searching for some rumored water hole," Olin Corp. v. Lamorak Ins. Co., 332 F. Supp. 3d 818, 875 (S.D.N.Y. 2018).

NPP[2]) treating Ms. Young. Plaintiff also had weekly therapy sessions with two other mental health counselors at IDCC, first Tracy Liang, MHC-LP,[3] and then for the last four months, Luigi Clemente, LMHC.

The regularity of these therapy sessions is impressive. It was rare that plaintiff went more than a week without one, and there were several times when she was in a particularly agitated or angry state that she had sessions twice a week. Because there are so many detailed treatment notes, it is possible to arrive at a very informed view of plaintiff's mental impairments over a long period – that is, how she was functioning week-to-week. Moreover, it should be presumed that when Mr. Reece filled out his medical reports on plaintiff, he had reviewed and was familiar with the treatment notes of his colleagues.

I cannot find that the ALJ adequately considered these treatment notes and how they informed Mr. Reece's opinion. Over a nearly four-year treatment period (the record contains the post-hearing treatment notes that were before the ALJ), the ALJ mentioned fewer than twenty notes from Mr. Reece, Ms. Liang, or Mr. Clemente. To be sure, the notes cited by the ALJ generally support his conclusion that Mr. Reece overstated the severity of plaintiff's impairments in his medical source statement. But like most severely impaired patients struggling with mental illness, plaintiff had good days and bad days. The ALJ's sampling is out of about 175 treatment

---

[2] Nurse Practitioner in Psychiatry, which, unlike a counselor or social worker, authorizes the license holder to prescribe scheduled medication.

[3] "Mental Health Counselors are qualified to evaluate and treat various issues people may be experiencing, such as depression, and anxiety. These are psychological counselors who have a master's degree in psychology, counseling, or a related field. After obtaining a master's degree, mental health counselors need an additional 2–4 years of experience in order to become fully licensed in their field. . . . While they are working toward their own license, they operate with a provisional license (Mental Health Counselor – Limited Permit). This simply means they must practice under the supervision of a licensed mental health professional, such as a psychologist or licensed mental health counselor (LMHC)." Lucas Saiter, What's the difference between a Psychotherapist, Psychologist, Psychiatrist, Mental Health Counselor, Psychoanalyst, and Social Worker, Clarity Therapy NYC (April 5, 2021), https://www.claritytherapynyc.com/what-is-psychotherapist-psychologist/ (last visited Nov. 17, 2021). By December 23, 2019, Ms. Liang had obtained her full license as an LMHC.

4

notes for the various sessions that plaintiff had with her three professionals. Just looking at the notes from Ms. Liang and Mr. Clemente, I can identify over 50 that describe plaintiff as having an affect that is arguably not suitable for the workplace – "agitated"; "irritable"; "depressed"; "guarded"; "crying;" "overwhelmed"; "anxious"; "angry"; "lethargic"; "hysterically tearful"; "oppositional"; "hyperactive"; and/or "frustrated." Only one treatment note uses just a couple of these adjectives – most are consistently employed to describe plaintiff's affect or mood. There is also no mention in the ALJ's decision that the treatment notes show plaintiff frequently relapsing into her alcoholism (although that seems to have gotten somewhat better as her therapy continued) and what effect that might have on her ability to work. It also seems more than arguable that the cumulative treatment notes generally corroborate plaintiff's testimony as to the impact of her mental impairments.[4]

The ALJ discounted Mr. Reece's opinion because: its "checkbox form" was unsupported by a detailed report or rationale; it did not opine on the degree of plaintiff's restrictions; its reference to plaintiff's poor memory[5] and a lack of concentration were not substantiated by the treatment records; and, in sum, the opinion was "simply not consistent with the evidence of record." I do not think these are adequate explanations considering the wealth of treatment notes from all the IDCC professionals that the ALJ did not digest.[6] Obviously, the ALJ does not have

---

[4] In its motion, the Commissioner has a somewhat more thorough presentation of the treatment notes than the ALJ. But the question is how the ALJ evaluates the treatment notes, not the Commissioner, unless the treatment notes show that a remand would be pointless. That is not the case here.

[5] One way to interpret Mr. Reece's reference to a "poor memory" is that he was focused on plaintiff's blocking out of the sexual assaults she suffered as a child, something that appears in the treatment notes. That inference is possible because the questionnaire mentioned memory in two places. First, in the "mental status" evaluation, next to the item "memory," Mr. Reece wrote "blocking." Later, when asked about her "understanding and memory," he noted "poor memory." Dr. Miller also noted that as to "remote memory skills," plaintiff was "[i]mpaired due to distractibility resultant to bipolar disorder. 1 out of 3 objects recalled immediately. 0 out of 3 objects recalled after a delay."

[6] I would not characterize Mr. Reece's medical source statement as a check-the-box form. There were no boxes to check; the form presented choices between a negative and positive answer to its questions. Each question required a

to recite every one of the treatment notes that are contained in this record. But if the ALJ is going to discount Mr. Reece's opinion as much as he did, there needs to be a more complete explanation of why the notes the ALJ decided to mention are representative. I cannot conclude from his opinion that they are.

My concern that the ALJ did not adequately consider the voluminous treatment notes is exacerbated by his assessment of the consulting psychologist, Dr. Miller. The ALJ was correct that several of Dr. Miller's observations were benign. But plaintiff's affect with Dr. Miller, as was often the case with her therapists, was dysphoric; and her short-term memory was problematic. Dr. Miller also observed that plaintiff was engaged in repetitive rocking (which can be a symptom of serious mental illness), and that she denied a history of alcohol abuse (which is flatly inconsistent with the IDCC treatment notes). Dr. Miller found that plaintiff had a severely limited ability to regulate emotions, control behavior, and maintain well-being, and a moderately limited ability to interact adequately with others. Dr. Miller also concluded that "her psychiatric problems are serious enough to interfere with her ability to find and maintain employment."

The ALJ found Dr. Miller's opinion only "somewhat persuasive" because it was "only somewhat consistent with the record as a whole in recognizing a meaningful degree of mental restriction." Again, since the most probative and voluminous part of the record is the IDCC treatment notes, the ALJ's conclusion is not adequately supported without a more detailed discussion of the treatment notes.

In other words, the ALJ's analysis begs the question: what does the record as a whole show? This is where my initial observation about the limitations of non-examining physicians'

---

short narrative response if Mr. Reece found a particular impairment present. Mr. Reece completed the narrative. However, because there was not much space after each question, his answers were accordingly brief. I would characterize the form more as a series of short-answer questions.

6

opinions kicks in. Ironically, one of the reasons the ALJ discounted Dr. Miller's opinion was because he only examined plaintiff once. But that approach is hard to square with the ALJ's simultaneous decision to accept the opinions of Drs. Gawley and Haus, who did not examine plaintiff at all and still concluded plaintiff was not disabled. The two mental health professionals on the record who examined plaintiff, one of them regularly, believe her mental impairments might well render her unable to work. It is just as likely that the conclusions of the disability analysts, Drs. K. Gawley and L. Haus, are the outliers on this record.

In sum, without a more substantial analysis of the IDCC treatment notes (because they are the largest and most important part of the record), the ALJ could not differentiate which medical opinions were consistent with the record and which were not. The case is therefore remanded so the ALJ can conduct an additional hearing and consider how all the treatment notes support or undermine the opinions of Mr. Reece, Dr. Miller, and the two disability analysts. In addition, the ALJ shall consider whether to have another consultative examination performed, or to have a medical expert testify at the hearing after being provided with all the treatment notes, Mr. Reece's source statement, and Dr. Miller's evaluation. The decision of the ALJ shall also include a thorough discussion of the treatment notes to the extent necessary to facilitate judicial review.

Plaintiff's motion for judgment on the pleadings is therefore granted, and the Commissioner's motion for judgment on the pleadings is denied. The case is remanded to the

Commissioner pursuant to 42 U.S.C. § 405(g) for a rehearing and decision consistent with the directions contained in the preceding paragraph.

**SO ORDERED.**

_____
U.S.D.J.

*Digitally signed by Brian M. Cogan*

Dated: Brooklyn, New York
November 17, 2021

8